16-20343-CIV

*Honorable Judge Donald M. Middlebrooks*

*United States District Court, Southern District of Florida*
*Paul G. Rogers Federal Building and U.S. Courthouse*
*701 Clematis Street, Room 257*
*West Palm Beach, Florida 33401*

**Re: Motion to Dismiss Case # 12-813-11-CIV-Middlebrooks/Bannon**
**Filed: Pro Se**

*Dear Judge Middlebrooks,*

*Your honor, my name is Bill Perry and I am writing you today because I have just recently discovered that there is a lawsuit that has been filed against me by the law firm by the name of Damian & Valori regarding the Hunter Wise case.*

*I am your honor to say these least appalled, disgusted and sickened that Damian & Valori would go out and make a claim like this against a man who in fact was the Whistleblower for the CFTC that I believe made the destruction of the Hunter Wise fraud possible in the first place and on top of it asking for over $500,000 from me.*

*Your honor, I would like if I may point out that I have not so much as set one foot in the United States since right around early 2012 and just returned on June 7th, 2016 which is way beyond the filing date of this complaint to which my movements can be verified by the U.S. State Department or other U.S. immigration agency that may keep track of American citizens that cross our border, and I have been homeless living in motels ever since finding it difficult to mentally get back on my feet for being out of the country for so long and settle in.*

*The point I am trying to make sir is I feel very strongly that this warrantless action brought against me should not only be immediately dropped with prejudice on it's complete lack of accuracy or merit, but also on the fact I just recently learned about the case through un-involved third party and I have not been served notice and wasn't even anywhere near the United States when apparently the action was filed or I was to be served.*

*Your honor, I hope you would agree that hiring a process server to go to a small bookkeeping and accounting office that I have never set foot in before located in Anchorage, Alaska and miraculously serving notice to me using an old bookkeeper I haven't seen in almost ten years as a proxy just because at one time she did me a favor and accepted some un-official mail for me way back when I needed a friend would hardly qualify as legally served and within the spirit of the law in my humble opinion and view sir, wouldn't you agree?*

*To begin with your honor I want it be known that I did not profit any monies no less anything near $500,000 from the Hunter Wise scheme at any time.  I never took in one single dollar from any investor/client/victim, nor did I ever sell anyone so much as one ounce of gold, other precious metal or commodity.  I like many other people, I was a victim in this Hunter Wise non-sense and when I discovered good evidence pointing to this being a scam, I immediately under my own free will called the CFTC to find out if I could learn more about who Hunter Wise really was.  I came to Hunter Wise in good heart and good faith by accident calling around investment banking types seeking to find software for a physical precious metals trading business I was planning only to be lured into a different business model I had never seen before and that I ended up paying Hunter Wise approximately $5500 to become one of their 'Dealers'.  I knew nothing about leverage back then either.  In fact, up to that point I had never traded any shares on the stock market either of any consequence and I was 40 years old.*

*Needless to say, they gave a good presentation, they were quite a bit older than me, their offices and staff were impressive as well as the fact they were part or seemingly part of what appeared to me at the time to be a very respectable, successful and well established investment banking organization in Hunter Wise*

1

Financial Group as I thought them to be and I was eager to learn this intricate business and get on with my working career.

Here is the rub your honor.  I may have signed up to be a Hunter Wise dealer, but the fact was I didn't have a clue yet what I was doing and I was riding on the idea that I could apply myself to the highest degree to really learn the precious metals trading business.  Knowing this, I embarked on building and perfecting my website (internationalmetals.com) before I would embark on taking on any clients or monies.  I was very adamant about that sir and it was common knowledge at Hunter Wise.  I sat there your honor for months and months toiling over this website trying to perfect it, stopping and starting again to get myself physically and mentally to be in what looked like a attention intensive and detail oriented business.

The fact is sir the whole deal was/is complicated and I couldn't quite figure it out.  While other "dealers" were at selling making a ton of money, I was still limping along trying to figure out how the calculations all worked for real and not just what the computer system that ultimately I would be dependent on to keep track of these complicated calculations was telling me.

I thought the reason I couldn't figure it out was because there were aspects to the business that was simply still over my head I had yet to learn and more importantly, me and my little website never got launched and the ad agency I paid over $10,000 to help me build it will testify to this very fact.  Everyone was aggravated at my tortoise like speed at went.

I had in fact your honor become a big joke to them because they thought I was some overly obsessive person who would toil over the smallest detail all the while other Hunter Wise dealers who were in fact in business taking orders and large sums of monies as you well know, soliciting clients, etc. while I was at home working in vain to finish the site and get to actual work to someday sell my first ounce of precious metal which <u>never happened</u>.

Another fact sir is that I was also trying to figure out not only what I was supposed to learn to be an active dealer which I was not and never became, but I also was starting to figure out something just wasn't right and I was being pressured by Ed Martin and Joe Dedios to quit playing with making my website 'look pretty" and just "get in the game" and start making sales and money.

Over and over I balked because I just couldn't pull it all together and just had more questions than the answers I needed to understand.  As time progressed and I learned more, it became more clear to me what questions I need to be asking and it was those questions I was finally able to come up with months and months later that led to Ed Martin telling me via email that out of all his dealers, or in my case, a would be dealer who never got off the bench or even in the ballpark for that matter, that I asked the most questions and they I will attest were very irritated about it to the point they threatened to just never do business with me when the time came I was ready to actually do business.

**Your honor, I attached a copy of those conversations with Ed Martin and Fred Jaeger included in the ("WB-APP") Form sent to the CFTC and mark it as as Exibit (1)**

It was about this time sir I was trying to get with a different firm called Bullion Management Group (bmgbullion.com) which is a $350,000,000 precious metals fund and physical metals trading business based in Toronto, Canada.  I was informed by an executive there (and my handler) that they (he and the President of the firm) smelled fraud at Hunter Wise which then seriously aroused my earlier inkling and feeling that something was starting to not feel right.  I think it is also important to note that I was never able to sell any metals as a Bullion Management Group Dealer either.  I signed the papers, but that's it.  No clients, no business, no money.

**Please accept attached Exibit (2) "BMG Dealer Agreement" as evidence of this relationship.**

A few weeks earlier your honor, I confronted Ed Martin via email and pressed him for information as to where exactly where these metals that they were using for their leverage program was and this was not the first time.  Now I was being persistent because the last call I had made was to Fred Jaeger himself before Ed Martin responded by telling me that I needed psychiatric help for insinuating this whole deal was

*not on the level and asked me if he needed to send a guy up in an airplane to write it in the sky for me and that he couldn't tell me where the metals where stored and I could go take my little un-productive question answering and truth seeking butt out into the street just the same if I was going to keep the inquiry up.*

*It was at this time I still was working on my website, had no clients, no marketing, no nothing but a $10,000 bill for web design services to a website that was not usable yet for what it was intended and out another $5500 to have the "privilege" of "studying" to become a gold dealer in a business model that turned out to be a fraud.*

*Sir, I would like to also point out that while all of this was going on, I was living in Costa Rica taking care of not only me, but a 8 year old boy not my own and his mother after I had just lost $359,000 which was basically my life savings after working 15 hours a day for 15 years only to discover that the business I was studying and working to be great at was a lie and I was also now out over a year of my working life with nothing to show for it which fueled severe suicidal thoughts and attributed to the ulcer like symptoms that In had to live with day in and day out for months on end and they still have still not gone completely away and now this action is bringing it all back which I would like to humbly add sir truly is adding insult to injury and it is in-humane.*

*It was somewhere around this time I decided to take it upon myself to contact the CFTC and ask them if they knew about Hunter Wise and to see if there was really something there or to see if I was crazy like Ed Martin said and they guys in Canada just off base.  I called CFTC and I spoke to several people, one of who is Attorney Carl Metzgar whom you know.  I told them who I was and that I was a Hunter Wise dealer in training and that I had reason to suspect fraud.*

**Upon hearing that, CFTC Attorney Metzgar produced a CFTC document which I am marking as Exibit (3) "Black Gold" and have attached your honor and another "Unimet" marked as Exibit (4).**

*One of these exibits was given to be by Mr. Metzgar, the other I believe I found online and Mr. Metzgar helped affirm that the Ed Martin I read about from the Google search was indeed the same Ed Martin and it became very clear that Mr. Metzgar wanted me and my information badly.*

*Mr. Metzgar produced this document to help convince me that Hunter Wise was indeed a fraud and that Ed Martin had been involved in a similar scheme years prior and had been disciplined/sanctioned by the CFTC and was barred from going anywhere near this type of business.*

*I was then asked if I would in fact like to come on board as an official Whistleblower for the CFTC. With this revelation by Mr. Metzgar which I took as convincing evidence that there was indeed most likely fraud going on coupled with the fact I had just almost my entire life savings just months prior in a separate matter, suicidal and sick and not wanting some older person to experience what living hell was experiencing at 42 in their 60's, coupled also with the fact the the CFTC told me that if I did come on board and they won the case, that as a Whistleblower I could get as a reward of up to 30% of what gets collected.  I said yes and signed what needed to be signed and then started to hand over all of the emails, training materials, training videos, statements, everything.  And your honor, they wanted it all because I am convinced they didn't have it all until me.*

*Attorney Metzgar and I were in contact for months.  In fact, my same instincts that were finally catching on to Hunter Wise then started to tell me that Carl Metzgar was being dishonest and manipulative.  The man did his best to get everything I could give him and during this had mentioned wanting me to also put together an exhaustive narrative about my whole story with Hunter Wise in detail at a later date.  When a significant period of time lapsed, a queried Mr. Metzgar about what exactly he wanted me to write.  He now tells me that he doesn't want me to write it afterall.  What he says he wants is for me to travel to his office in Chicago from Costa Rica and meet him there where instead of me writing it out long hand, he says he is the attorney and he will now do the writing in the proper format and delivery so as to get the best result.  As a result, I travel all the way to Chicago and call Mr. Metzger as instructed about setting a firm time to meet to go over this deposition like de-briefing and to my amazement he all of a sudden he*

*Changing gears a bit sir, please allow me to discuss some other facts if I may.  Early on and soon after I signed with Hunter Wise, I decided I wanted to test the whole operation and buy <u>myself</u> 70 ounces of gold bullion bars and take delivery of them for <u>myself.</u>*

*<u>Here are the order details</u>*
*Date: October 10th, 2009*
*Account: #10140-01*
*Trade ID #12871*
*Product: (7) 10 oz gold bars*
*Price Each: $10,847.70*
*Total: $75,933.90*

**<u>I have attached what I am labeling as Exibit (5) which is a record of that purchase.</u>**

*Your honor, truth be told I had never in my life purchased gold or owned gold before this purchase.  With my own money I had legitimately earned years prior, I ordered (7) 10 oz gold bars from Joe Dedios (at a price Hunter Wise profited from) and sure enough a week or so later they were delivered to me via insured carrier at my mother's house in Indiana where I was staying briefly at the time which was now years ago.  The novelty of holding physical gold quickly wore off and the realization that what I was now holding was a security risk to physically have, so I decided to sell them right back to Hunter Wise at their Bid Price which I did.*

*Your honor, that transaction took place and I didn't make another one until six months later on April 28th, 2010 when I made a purchase on my own account with my own money I had earned years prior and felt brave enough to try a leveraged transaction on the system which I purchased or shorted 200 oz of palladium which I was able to control with a loan from Hunter Wise and me only putting 25% down and profited <u>at most</u> approximately $1500-$2500 on this single trade before closing the position.*

*Moreover sir, somehow on 10/07/11 now a <u>full 18 months</u> after the last transaction I made with Hunter Wise mentioned above on 4/28/2010, I ended up purchasing 30 oz of gold from Hunter Wise on leverage with only $12,504.83 of my own hard earned money which left me paying off a high interest loan of approximately $38,000 from Hunter Wise.*

**I have attached what I have marked as Exibit (6) as evidence of this transaction as well your honor.**

**Further sir I have also attached Exibit (7) which is a report generated on 12/31/2011 that shows as of that date, I was still holding those same 30 oz of gold for 85 days for a <u>loss</u> of ($5113.92).**

*Finally your honor, the only other business I did with Hunter Wise was near the end not too long I became an official Whistleblower for the CFTC.  Ed Martin proved to me he was a licensed in California to make loans under the Licensed Lender Law and offered me 3% interest on the money I had in my bank for short period of time that was sitting in my money market account at my bank earning less than 0.75% interest.*

*That large deposit only sat with Hunter Wise for maybe 50-60 days or less and it was around that time Bullion Management Group in Toronto came to me with their concerns about Hunter Wise. With that I very panickly told Ed Martin I wanted that deposit back asap which was in fact sent to me (International Metals Trading & Investments, Ltd.) which there exists several records of.  Those funds were my funds from my prior life working 15 years for 15 hours a day as a door-to-door ATM machine salesman which I did from 1996-2008.*

*This money I deposited with Hunter was money I had that I didn't want to speculate with and was to be the foundation of my business moving forward which by now was getting close but <u>never</u> materialized.  I never in all this time since I was born in 1971 to this day have I sold any individual, company or anyone else for that matter one single ounce of any precious metal or commodity except back to the same people I purchased it from at Hunter Wise nor have I given any loans to anyone.  I have also taken in absolutely*

*zero client monies. I did nothing but make a few trades on my own account, paid a premium to do it and lost money and very luckily took that deposit back soon after I made it.*

*And yet on top of all of this, the less than a handful of trades I did make, one being the leverage loan to get 200 oz of palladium on 04/28/2010 and the other leveraged loan for the 30 oz of gold I took out on 10/07/2011, I also paid a premium for a spread and a finance charge and was also un-knowingly at the time holding nothing but paper as well representing metals Hunter Wise never purchased apparently.*

**I did however receive a "Commodity Transfer Notice" as Hunter's evidence to me that the metals were purchased like every other victim of this scam which I am attaching here as Exibit (8).**

*In closing your honor, I went into this with good faith and maintained that good faith until the very end without ever bringing on one client to Hunter Wise. I took no orders nor did I help facilitate any orders and did so under significant pressure to do so. I did not bring in any money to Hunter Wise except my own that was earned and accounted for years prior and evidence exists of this fact. All monies sent to Hunter Wise were monies already earned and accounted for and all monies returned to me were from these monies of my own and my own only.*

*I was a man simply sitting on the bench watching, studying and learning being responsible to not only myself, but any future clients I dreamed of bringing on that would have put my name on the deal and put my name in jeapordy and I prevailed. I am proud I was not a part of that scam other that that of a victim as well. I also believe I did the right and honorable thing by going to the CFTC for the right an honorable reason and I stand here before you today knowing in my heart I don't deserve this.*

*Where did my financial enrichment occur? I lost money and so much more and by my understanding, did more than my part to help sheild what I heard was somewhere in the neighborhood of 3000 investors worldwide from further financial ruin and yet here I am in a battle with Damian & Valori who very may well have received the Receivership and what I am sure is plenty in attorney's fees in part because of my action of good faith in the first place.*

*I request your honor that this case against me be immediately dropped with predjudice so as to allow me to put this now seven year miserable chapter of my life behind me. Damian & Valori is either greatly mistaken in this case or they acting recklessly in very poor faith.*

*I deserve better and I hope you will agree with me sir.*

*Warm Regards,*

*Bill Dean Perry*
*November 10th, 2016*

*Telephone: (312)546-7627*
*Fax: (312) 803-0938*

*EXHIBIT "I"*

## G. ENTITLEMENT TO AWARD

Explain the basis for your belief that you are entitled to an award in connection with your submission of information to the CFTC, or to another agency or organization in a related action.  Provide any additional information that you think may be relevant in light of the criteria for determining the amount of an award set forth in Section 23 of the Commodity Exchange Act and Part 165 of the CFTC's regulations.  Include any supporting documents in your possession or control, and use additional sheets, if necessary.

On January 1, 2011 Bill Perry through his company U.S. Capital Investment Management, LTD. signed a Hunter Wise Commodities LLC Dealer Services Agreement to become a precious metal dealer for Hunter Wise in order to sell his customers precious metals through Hunter Wise.  The Hunter Wise Agreement stated that Hunter Wise would provide the Dealers the following services: "a. Preparation of client trade confirmations, b. Preparation of client month-end statements, c. Preparation of client equity call notices, d. Preparation of year-end 1099's for clients & IRS, e. Preparation of client title transfer notices, f. Access to client & Dealer portals, and g.  Preparation of notices to Dealer's clients that they are at force liquidation levels."  (See attached as Exhibit 1 Hunter Wise Commodities LLC Dealer Services Agreement signed 1/1/2011).

From review of this agreement Mr.  Perry initially believed Hunter Wise was a legitimate physical commodity trading company.  He signed the agreement and paid Hunter Wise $5,500 to become a precious metal dealer.  He was instructed to sign various other documents such as the Dealer Purchase & Sale Agreement which is an agreement between Hunter Wise Trading, LLC and a Dealer that established an account for Mr. Perry to be able to purchase and sell commodities and to purchase metal on credit with a trading  affiliate, Hunter Wise Credit LLC.  The agreement stated that upon full payment for the purchase of commodities the commodity will be delivered to the Dealer and "upon receipt of good funds in partial payment equal to the minimum down payment required by Credit for commodities purchased on credit, Trading shall deliver to Depository within seven(7) days."  (See attached as Exhibit 2 Hunter Wise Trading Dealer Purchase & Sale Agreement).  He also signed the Hunter Wise Credit, LLC Dealer Loan, Security & Storage Agreement which set forth the terms of the credit that will be lent to the Dealer.  In this Agreement a Depository is defined and the Agreements stated that commodities will be delivered as an undivided share of a fungible lot and held in safekeeping on a fungible basis. It further stated the Dealer will receive confirmation of the delivery to the Depository and will be charged shipping and delivery fees.  The Agreement stated that "Credit and Depository shall have no obligation to provide possession of the commodities ..until such time Dealer has made full payment of all indebtedness (including, without limitation payment for any applicable storage and deliver charges)." (See attached as Exhibit 3 Hunter Wise Credit, LLC, Dealer Loan, Security & Storage Agreement.)

Mr. Perry also received Dealer Portal Instructions from Hunter Wise which set forth instructions for maintaining a customer's database including all trading activities, product lists, spreads and charges through the Hunter Wise Commodities Dealer Portal. (See attached as Exhibit 4 Hunter Wise Commodities, LLC Dealer Portal Instructions).  He was also given a Dealer Portal User Guide which is an extensive explanation of the Dealer Portal, its use, and creation of a username and password that permitted access to various Customer Export Reports such as Equity calls, Product list, Closing Prices,Closing Prices by Date, Position Listing, Position Summary, Profit (loss) Open Positions, Position Summary by AE, Cash Transactions, Customer Portfolio, Dealer Volume, Volume by Salesman, Dealer Commission Listing, Active Salesman List, Customer Position by AE and Revenue and a Glossary of key terms.   (See attached as Exhibit 5 Hunter Wise Commodities Dealer Portal User Guide).

Page  1                                                    (continued)

4

title to any metals and does not actually deliver any physical commodity to any of its dealers or retain customers. *CFTC Complaint Page 13 Paragraph 16 and Page 14, Paragraph 51-52*.    "Defendants continue to lie about the purchase, delivery and storage of physical metals in Retail Commodity Transactions throughout the course of their relationship with their retail customers.  Defendants falsely claim to "ship" or "receive" metals following each trade in what they call a Transfer of Commodity notice." *CFTC Complaint Page 19, Paragraph 67.*    Page 19 and 20 of the Complaint specifically sets forth facts regarding the Transfer of Commodity Notice and the misleading information contained in it.  This is the information and illegal activity that Mr. Perry blew the whistle on by calling the CFTC.  He kept asking Hunter Wise who the depository was as a way to track the purchase of the physical metal and realized after Hunter Wise's lack of honesty that Hunter Wise was an illegal outfit. **(Exhibits 10-15).** In fact in his email to Sue Morales of the CFTC he stated: "I've been asking them where the metals are stored and why isn't it in plain English with in the Commodity Transfer Notice." **(Exhibit 11)**

Page 21 of the Complaint discussed the "so-called loan" or "financed portion of the Retail Commodity Transactions" and the 9.5% per annum charged as interest on these purported loans.  This information was obtained from **Exhibit 7** and Training Module 6 Leverage Transaction Cost **Exhibit 8**.

The CFTC Complaint stated that Hunter Wise provided dealers and retail customers with "various levels of access to account information in the Hunter Wise database through web access that it calls the portal." *CFTC Complaint Page 23, Paragraph 87.*  It further stated Hunter Wise allowed dealers access to reports and data about retail customer accounts, including but not limited to: (a) Equity Runs; (b) Firm Volume Reports; (c) Salesman Volume Reports; (d) Commission Listings; (e) Active Salesman Lists; and (f) Revenue Reports." *CFTC Complaint Page 23, paragraph 90.* Mr. Perry produced all of the evidence to the CFTC.  The Dealer Portal Instructions and the Dealer Portal User Guide provided instructions on the portal and the various export reports a dealer can generate from its customers' accounts. **(Exhibits 4 and 5).**

The CFTC also referenced in its Complaint the form contracts and documents it gave its dealers access for their retail customers.  The form contracts listed were the Restricted State List, Corporate Resolution, Limited Power of Attorney, Revocation of Power of Attorney, Compliance Manual, Anti Money Laundering Policies and Procedures, Order taping Scripts, Customer Application & Signature Page, Customer Loan Security & Storage Agreement, Customer Purchase and Sales Agreement, Truth-in-Lending Statement, Risk Disclosure Statement, Supplemental Risk Disclosures, and the Statement of Estimated Costs and Break even. *CFTC Complaint Page 24 Paragraph 92.*  All of this evidence was provided to the CFTC by Mr. Perry.  **(Exhibit 6)**

The Complaint stated that Hunter Wise provided its dealers with training videos that explained the "various aspects of Retail Commodity Transactions. These training videos include: (a) Course Introduction: (b) Available Products; (c) Basic Terminology

and Fundamental Concepts; (d) Overview of the Leverage Transaction/Fully-Paid Leverage Comparison; (f) Leverage Transaction Costs/Estimating the Breakeven Point; (g) Estimating the Equity Call and Force Liquidation Levels on Long Positions; (h) Adjusting the Equity Call Level to Fit the Client's Risk Tolerance; (i) Estimating the Equity Call Amount on a Long Position/Minimum Liquidation Calculations; (j) Leverage Transaction Risk Analysis/Non-Recourse; and (k) Overview of Commodity Loan ("short") Transactions." *CFTC Complaint Page 24 Paragraph 95 through Page 25.* Mr. Perry furnished the CFTC with these **exact** training module videos. **(Exhibit 8)**

Through the assistance of Mr. Perry the CFTC was able to charge Ed Martin and Fred Jager with violation of Section 4(a) of the Act, specifically illegal, off-exchange transactions. *CFTC Complaint Page 28 Paragraph 113.* The CFTC was able to charge Hunter Wise for misrepresentation and omission of fact for misrepresenting "that it purchased, sold, loaned, stored and delivered physical metals in Retail Commodity Transactions." *CFTC Complaint Page 30 Paragraph 121-122.* It was also able to charge Hunter Wise and all its affiliates with fraud in connection with contracts of sale of commodities in interstate commerce through misrepresentation and omission of facts contained in its Transfer of Commodity notices, trade confirmations and accounts statements sent to retail customers. *CFTC Complaint Page 32 Paragraph 131.* The Dealer portal instructions produced to the CFTC by Mr. Perry stated specifically how these statements such as the notices, trade confirmations and account statement were generated and the information contained in each. Additionally, in his emails to Hunter Wise Mr. Perry discusses the Commodity Transfer Notices and the information contained in it. **(Exhibit 11).**

In the 58 page Order dated May 16, 2014 with the Notice of Covered Action on June 1, 2014 Judge Donald M. Middlebrooks of the U.S. District Court, Southern District of Florida ordered Defendants to pay $52.6 million in restitution to the defrauded customers and to pay a civil monetary penalty in the amount of $55.4 million. Judge Middlebrooks found that Hunter Wise principals Jager and Martin knowingly defrauded more than 3,200 retail customers and their conduct was "repeated, callous, and blatant." Pursuant to the Order Hunter Wise's multi-level marketing involved dealers who served a sales function and solicited customer accounts. Using marketing materials and training videos provided to them by Jager, Martin and other Hunter Wise employees the dealers claimed to arrange loans and told customers that their metals would be stored in a secured depository. The customers were charged "exorbitant interest" on their loans and storage fees for the metal they thought they purchased but in fact it was all fraudulent. Mr. Perry made a $75,000 purchase with his own personal money to uncover Hunter Wise's illegal operations. If it wasn't for Mr. Perry's diligent investigation the CFTC would not have been aware of the Hunter Wise Scheme.

In accordance with 7 USC 26 (Commodity Whistleblower Incentives and Protection) whistleblowers should receive a reward of 10 percent to 30 percent based on the amount the CFTC collects as a result of the whistleblower's information, if more than $1 million is collected. In determining the amount of the Whistleblower's award the Commission shall take into consideration the I) the significance of the information II) the



# TLG  Thomas Law Group P.C.
### ATTORNEYS AT LAW

SECURITIES AND COMMODITIES
LITIGATION AND ARBITRATION

2910 JEFFERSON STREET
SUITE 204
CARLSBAD, CA 92008

TEL 760 720-9600
FAX 760 720-9690

www.ThomasLawGroup.net
EMAIL: PWT@PAULTHOMASLAW.COM

August 28, 2014

**VIA FEDEX AND FACSIMILE**
Commodity Futures Trading Commission
Whistleblower Office
1155 21st Street, NW
Washington, DC 20581

**Re: Form WB-APP**
**Bill D. Perry**

Dear Sir/Madam:

The undersigned counsel represents Mr. Bill Perry pursuant to the Dodd-Frank Act which allows for the payment of monetary awards to eligible whistleblowers. Enclosed please find Mr. Perry's completed Form WB-APP with 21 exhibits. Due to the size of the filing the undersigned is faxing the completed WB-APP form with attachment (10 pages) only. The hard copy of the filing with the corresponding exhibits (21) has been sent via FedEx for the next day delivery.

Should you have any questions please feel free to contact me.

Best Regards,

THOMAS LAW GROUP P.C.

By: _____
NEDA ATAIE, ESQ.

NA/fb
Encl.

m:Fax - International Metals  (19054741091)                 09:08 06/16/11GMT-06 Pg 38-46                    *EXHIBIT "2"*

---

*Bullion Custodial Services Inc.*

# Authorized Dealer Agreement for
# BMG BullionBars

This Agreement shall be effective between **Bullion Custodial Services Inc.**, a body corporate doing business in the Province of Ontario, Canada (hereinafter defined as "BCS") and the **Authorized Dealer** as hereinafter defined.

**WHEREAS** BCS wishes to appoint the Authorized Dealer, in a non-exclusive capacity, to market and distribute BMG BullionBars™ and custodial services to its customers,

**NOW THEREFORE** this Agreement witnesseth that, in consideration of the mutual covenants, benefits and obligations contained herein, the receipt and sufficiency of which are hereby acknowledged, BCS and the Authorized Dealer hereby agree as follows:

**1.0**      <u>Interpretation</u>

Unless expressly provided otherwise, where used in this Agreement, the following terms have the following meanings, respectively:

**"Acknowledgement of Charges and Fees Form"** means the form signed by the Client and submitted through an Authorized Dealer to BCS describing various charges and fees associated with the Client's purchase of BMG BullionBars, as the same may be amended from time to time.

**"Authorized Dealer"** means a dealer that has been approved by BCS as an Authorized Dealer for the marketing and distribution of BMG BullionBars and custodial services.

**"Authorized Dealer Agreement"** means this Agreement as amended from time to time in accordance with Section 7.1 hereof.

**"Authorized Dealer's Fee"** has the meaning ascribed to it in Section 5 hereof.

**"Authorized Sales Representative"** means a sales representative who is employed by the Authorized Dealer and approved by BCS.

**"BMG BullionBar"** is a gold, silver or platinum bullion bar that meets Good Delivery Standards and is sold through an Authorized Dealer.

**"Bullion Client Agreements"** are collectively the Bullion Purchase Agreement, the Bullion Custodial and Administrative Services Agreement and the Bullion Delivery Agreement, as amended from time to time in accordance with Section 7.1 hereof.

**"Clients"** mean purchasers of BMG BullionBars and custodial and administrative services through the Authorized Dealer.

"**Code of Conduct**" means the Dealer Code of Conduct as from time to time adopted by BCS.

"**Good Delivery Standards**" means the industry-recognized standards for the classification of bullion bars used within the precious metals industry and adopted for use by BCS from time to time. The specifications indicate acceptable ranges of bar size, weight, purity, and dimensions.

"**Mandatary Agreement**" means the agreement between BCS and an Authorized Dealer whereby the Authorized Dealer agrees to act as a Mandatary to identify each Client and provide all requested documentation, as may be required by BCS, as it relates to BCS's responsibilities under Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC").

"**Person**" includes any individual, corporation, limited partnership, general partnership, joint stock company or association, joint venture association, company, trust, bank, trust company, land trust, investment trust, society or other entity, organization, syndicate whether incorporated or not, trustee, estate trustee, executor or other legal or personal representative, and governments and agencies and political subdivisions thereof.

"**Volume Discount Particulars**" prescribes reduced rates for specific charges and fees to be applied for Clients according to the level of purchases that they have made at a particular point in time.  The Volume Discount Particulars overrides the Acknowledgement of Charges and Fees Form.

1.1    The division of this Agreement into sections, subsections, paragraphs and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. Unless something in the subject matter or context is inconsistent therewith, references herein to sections, subsections, paragraphs and other subdivisions are to sections, subsections, paragraphs and other subdivisions of this Agreement.

1.2    This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

1.3    Unless otherwise stated herein, all amounts expressed herein in terms of money refer to U.S. Dollars and all payments to be made hereunder shall be made in U.S. Dollars.

**2.0    Nature of BMG BullionBars**

2.1    BMG BullionBars are individual, investment grade, bars of gold, silver and platinum bullion that meet Good Delivery Standards and are sold only through Authorized Dealers.

**3.0    Covenants and Representations of the Authorized Dealer**

3.1    The Authorized Dealer covenants with BCS that it:

*Authorized Dealer Agreement*

a) will exercise all reasonable commercial efforts in order to promote BMG BullionBars to the Authorized Dealer's contact base of prospective Clients;

b) will use the official logos and trademarks for BMG BullionBars provided by BCS, from time to time, on its business communications, and will not use any other logos or trademarks without the prior written consent of BCS;

c) will not deliver, or allow to be delivered, to any Client or prospective Client, any document or material relating to BMG BullionBars, other than materials created by BCS or other materials that have been reviewed and approved by BCS;

d) will not use or modify any website containing information regarding BMG BullionBars until approved by BCS in writing;

e) will at all times abide by, and will cause all of its Authorized Sales Representatives to abide by at all times, the Code of Conduct;

f) will perform any and all duties required as a Mandatary for BCS, with due care, in an honest and forthright manner.

**4.0   <u>Authorized Dealer's Duties and Responsibilities</u>**

4.1   The Authorized Dealer acknowledges having read and understood the standard form Bullion Client Agreements, the Dealer Code of Conduct, the Acknowledgement of Charges and Fees Form and the Volume Discount Particulars provided concurrently herewith.

4.2   The Authorized Dealer acknowledges that BCS is a registrant with the Financial Transactions and Reports Analysis Centre of Canada ("FINTRAC") as a Dealer in Precious Metals and Stones. As a registrant, any and all transactions with both domestic and international clients are assessed and completed in accordance with the regulations, guidelines, and directives established by FINTRAC, in our collaborative effort to minimize or eliminate the risks associated with money laundering, and terrorist financing activities.

4.3   From time to time BCS may amend or modify and forward to the Authorized Dealer various standard forms and other documents relating to Authorized Dealers, and it shall be the responsibility of the Authorized Dealer to review, on a regular basis, the most recent versions of such forms and documents. In the event of a conflict with any previous version of any form or document, the most recent version shall prevail.

4.4   The Authorized Dealer will provide both initial and ongoing support to Clients as follows:

a) meeting with Clients and prospective Clients and presenting approved information about BMG BullionBars;

b) explaining to Clients the procedures for placing orders for BMG BullionBars on the dedicated online order processing system;

c) assisting prospective Clients in completing the Client application form and providing other documentation before they are approved;

    d)   explaining all legal documentation and methods and procedures for completing sales to prospective Clients;

    e)   assisting Clients in preparing delivery documents; and

    f)   acting as a Mandatary to identify every Client in the manner required by FINTRAC in accordance with the Mandatary Agreement.

4.5    The Authorized Dealer shall be responsible for ensuring that all of its Authorized Sales Representatives complete and submit the necessary forms and are approved by BCS.

4.6    The Authorized Dealer and all of its Authorized Sales Representatives must complete the BCS standard form Confidentiality, Non-Disclosure, Non-Circumvention and Non-Compete Agreement as part of the initial application to be approved by BCS.

4.7    The Authorized Dealer will not allow any persons not approved by BCS to make any representations to Clients with respect to BCS or BMG BullionBars.

4.8    The Authorized Dealer shall be responsible for the actions of all Authorized Sales Representatives employed by the Authorized Dealer. Notwithstanding anything to the contrary herein contained, any breach of the provisions of this Agreement by any Authorized Sales Representative shall be grounds for immediate termination of that Authorized Sales Representative by the Authorized Dealer, and the Authorized Dealer agrees to dismiss any such Authorized Sales Representative if so requested by BCS.

4.9    The Authorized Dealer acknowledges having read and understood the Code of Conduct provided concurrently herewith. Any breach of this Code of Conduct by the Authorized Dealer or any of its Authorized Sales Representatives shall be grounds for immediate termination of this Agreement by BCS.

4.10    The Authorized Dealer must maintain the confidentiality of confidential information entrusted to the Authorized Dealer by BCS and persons with whom BCS does business, except when disclosure is authorized by BCS. Confidential information includes all non-public information that might be of use to competitors or be harmful to BCS if disclosed. The obligation to preserve confidential information continues for a period of 2 years even after the Authorized Dealer ceases to have a relationship with BCS.

4.11    The Authorized Dealer must immediately give written notice to BCS with respect to any changes to the Authorized Dealer's contact particulars including mailing address, telephone number, fax number and email address.

4.12    Forthwith upon being approved as an Authorized Dealer, the Authorized Dealer shall pay $2,500 to BCS to cover BCS' dealer package and initial start-up requirements for new Authorized Dealers, which will include:

    a)   Administrative processing of the Authorized Dealer's initial application

    b)   Initial training

    c)   Initial supply of brochures customized with the Authorized Dealer's contact information

    d)   Initial supply of customized BMG business cards

    e)   Up to two criminal background checks ($200 per additional person)
    f)   Power point presentation
    g)   Assistance with advertizing copy
    h)   Access to the BMG BullionBars website
    i)   Assistance for the Authorized Dealer to create its own website to promote the sale of BMG BullionBars
    j)   Marketing materials in pdf format for easy distribution
    k)   Two 10 ounce silver bars and ten 1 ounce silver key chains with the BMG logo for promotional purposes

**5.0    <u>Authorized Dealer's Compensation</u>**

5.1    In consideration of the Authorized Dealer's services to be rendered to BCS in connection with this Agreement, including, without limitation, soliciting offers to purchase BMG BullionBars from Clients, preparation of relevant documentation, performing administrative work in connection with such matters, and all other services arising out of this Agreement, BCS agrees, subject to and upon the terms and conditions set out herein, to pay or cause to be paid to the Authorized Dealer a fee (the "Authorized Dealer's Fee") with respect to BMG BullionBars for which it is the Authorized Dealer.

5.2    If the Authorized Dealer operates on a commission basis with a Client, the whole of the following fee shall be payable. If the Authorized Dealer operates on a fee basis with the Client, only the BCS portion of the fee shall be payable. The Authorized Dealer's Fee is comprised of the following three components:

    a)   The first component is the Authorized Dealer's share of the actual "Purchase Charge" for his particular Clients determined in accordance with the current Acknowledgement of Charges and Fees Form applicable with respect to a particular Client but subject to the Volume Discount Particulars, if applicable. This component shall be paid monthly on the 15th or the last day of each month. The payment date for any transaction shall be the next regularly scheduled payment date that occurs after no less than five (5) business days following the receipt by BCS of the BCS Account Reconciliation for the transaction.

    b)   The second component will be the Authorized Dealer's share of the actual ongoing "Custodial and Service Fee" for his particular Clients, being the Service portion thereof, determined in accordance with the current Acknowledgement of Charges and Fees Form applicable with respect to a particular Client but subject to the Volume Discount Particulars, if applicable. This component shall be calculated daily and paid monthly on the 15th day of the following month.

    c)   The third component will be the Authorized Dealer's share of the actual "Sales Charge" for his particular Clients determined in accordance with the current Acknowledgement of Charges and Fees Form applicable with respect to a particular Client but subject to the Volume Discount Particulars, if applicable. This component shall be paid monthly on the 15th or the last day of each month. The payment date for any transaction shall be the next regularly scheduled

payment date that occurs after no less than seven (7) business days following the receipt by BCS of the BCS Account Reconciliation for the transaction.

5.3     Payment of the Authorized Dealer's Fee in respect of BMG BullionBars in custody on the last business day prior to the termination of this Agreement otherwise than by BCS pursuant to section 7.2 will survive this Agreement for so long as the BMG BullionBars remain in custody.  The Authorized Dealer shall also be entitled to payment of the Authorized Dealer's Fee for all additional BMG BullionBars sold after the termination of this Agreement otherwise than by BCS pursuant to section 7.2 to any Client with BMG BullionBars in custody on the last business day prior to the termination of this Agreement so long as those additional BMG BullionBars remain in custody, but only so long as the Authorized Dealer continues to service those Clients and has not been terminated by the Client under the Bullion Client Agreement.  For greater certainty, in the event of termination of this Agreement by BCS pursuant to section 7.2 then the Authorized Dealer shall only be entitled to payment of those Authorized Dealer's Fees that were accrued and unpaid on the effective date of termination.

5.4     The Authorized Dealer acknowledges and agrees that the Authorized Dealer's Fee includes all GST, HST and other sales or value added taxes or withholdings that may be exigible on such fees in any jurisdiction and that the Authorized Dealer shall be responsible for the payment and remittance of all amounts so exigible.

5.5     The Authorized Dealer is acting as an independent contractor of BCS and is not an employee, agent or partner of BCS. The Authorized Dealer will be responsible for compliance with all applicable laws. The Authorized Dealer will not represent itself as an agent of BCS and will not commit or obligate BCS in any way to other parties. The Authorized Dealer covenants that it will, at its own expense, pay all income taxes, unemployment insurance premiums, pension plan premiums, workers' compensation contributions and all other taxes, charges and contributions levied or required by all competent governmental authorities arising out of or in connection with the transactions contemplated herein.

5.6     The Authorized Dealer is responsible for the payment of all costs and expenses incurred in the fulfillment of this Agreement unless previously agreed to in writing by BCS.

6.0     **Representations, Warranties and Covenants of BCS**

6.1     BCS hereby covenants with the Authorized Dealer that:

        a)  It is a corporation duly organized, validly existing and in good standing under the laws of the Province of Ontario, Canada;
        b)  it will maintain the confidentiality of confidential information entrusted to it by the Authorized Dealer and persons with whom the Authorized Dealer does business, except when disclosure is required by applicable law or authorized by the Authorized Dealer.  Confidential information includes all non-public information that might be of use to competitors or harmful to the Authorized Dealer.   The obligation to preserve confidential information

*Authorized Dealer Agreement*

continues for a period of 2 years even after BCS ceases to have a relationship with the Authorized Dealer.

6.2    BCS hereby covenants with the Authorized Dealer that BCS will not attempt to circumvent the Authorized Dealer by dealing directly with Clients introduced to BCS by the Authorized Dealer or prospects that have been registered with BCS and acknowledged by BCS as prospects of the Authorized Dealer.

### 7.0    Amendment and Termination

7.1    In the event that any of the Bullion Client Agreements are amended, modified or otherwise changed by BCS, BCS shall give written notification to the Authorized Dealer of such amendment, modification or change .

7.2    BCS may terminate this Agreement if the Authorized Dealer breaches any of its material obligations under this Agreement or any other agreement between BCS and the Authorized Dealer and such breach has not been cured within 60 days following written notice thereof from BCS.  In addition, BCS may immediately terminate this Agreement at any time by written notice after the occurrence of any of the following events:

   a)    If the Authorized Dealer commits any material misrepresentation or any dishonest or fraudulent act in the performance of any obligations hereunder, or is charged with the commission of any securities offence;

   b)    If the Authorized Dealer fails to generate gross sales of BMG BullionBars of at least $250,000 for any given three month period or fails to maintain a minimum of  $1,000,000 of market value of BMG BullionBars in custody at all times after one year;

   c)    if any application, petition, proposal or proceeding is made, filed or taken by the Authorized Dealer or any effective resolution passed by its directors or shareholders with respect to the bankruptcy or insolvency, dissolution, liquidation or winding up, or arrangement, compromise or readjustment of any debt, of the Authorized Dealer or if the Authorized Dealer makes a general assignment for the benefit of its creditors or admits in writing its inability to pay its debts generally as they become due;

   d)    if any interest of the Authorized Dealer in any of their respective assets or property is sold or foreclosed by any creditor or encumbrancer or any person acting under legal process, or if any encumbrancer takes possession, or if any person assumes control through legal process, of the assets and property of the Authorized Dealer or any substantial part thereof, unless such possession or control is being contested in good faith by appropriate and diligent action, or if any execution, judgment or any similar process remains unsatisfied for such period as would permit any significant assets or property of the Authorized Dealer to be sold thereunder.

4:39 AM
11/08/16
Accrual Basis

**International Metals**
**Account QuickReport**
All Transactions

Page 1

| Type | Date | Memo | Split | Amount | Balance |
|---|---|---|---|---|---|
| **Hunter Wise # 10202-01** | | | | | |
| Transfer | 2/1/2011 | Funds Transfer | Hunter Wise # 10140-01 | 2,500.00 | 2,500.00 |
| Transfer | 2/2/2011 | Funds Transfer | Hunter Wise # 10140-01 | 149,168.63 | 151,668.63 |
| Check | 2/2/2011 | | Licensing | -2,500.00 | 149,168.63 |
| Deposit | 2/28/2011 | Deposit | Interest Income | 335.63 | 149,504.26 |
| Check | 3/31/2011 | | Bank Service Charges | -250.03 | 149,254.23 |
| Deposit | 3/31/2011 | Deposit | Interest Income | 386.22 | 149,640.45 |
| Deposit | 4/19/2011 | Deposit | Closing Sale | 103,631.50 | 253,271.95 |
| Deposit | 4/30/2011 | Deposit | Interest Income | 477.74 | 253,749.69 |
| Check | 4/30/2011 | | Bank Service Charges | -210.27 | 253,539.42 |
| Deposit | 5/31/2011 | Deposit | Interest Income | 485.95 | 254,025.37 |
| Transfer | 5/31/2011 | Funds Transfer | Hunter Wise # 10217-01 | -254,025.37 | 0.00 |
| **Total Hunter Wise # 10202-01** | | | | 0.00 | 0.00 |
| **TOTAL** | | | | 0.00 | 0.00 |



Hunter Wise Trading, LLC
Hunter Wise Financial Services, LLC

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for September 2009

Page 1 of 1

Bill Perry
980 North Michigan Ave
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $0.00 | $108,500.00 | $200,056.21 | $91,556.21 | $0 | $91,556.21 |

### Breakdown of Ending Balance

| | |
|---|---|
| $0.00  -Loan Balance on Commoditites Purchased | $56.21  -Accumulated loan fees less cash applied to loans |
| $91,500.00  Unallocated Funds - Cash not being used as equity. | |

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 9/24/09 | Cash Received from you | | 100,000.00 | | |
| 9/25/09 | Cash Received from you | 100,000.00 | | | |
| 9/25/09 | Cash Received from you | | 99,975.00 | | |
| 9/25/09 | Wire Fee Credit | | 25.00 | | |
| 9/28/09 | Cash Sent to you | 8,500.00 | | | |
| 9/30/09 | Interest received | | 56.21 | | |
| | Totals: | $108,500.00 | $200,056.21 | | |



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services. LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for October 2009

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $91,556.21 | $147,520.63 | $80,235.13 | $24,270.71 | $0 | $24,270.71 |

## Breakdown of Ending Balance

| $0.00 | -Loan Balance on Commoditites Purchased | $204.61 | -Accumulated loan fees less cash applied to loans |
|---|---|---|---|
| $24,066.10 | Unallocated Funds - Cash not being used as equity. | | |

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 10/5/09 | Cash Sent to you | 71,586.73 | | | |
| 10/8/09 | Cash Received from you | | 71,586.73 | | |
| 10/15/09 | Cash Received from you | | 8,500.00 | | |
| 10/19/09 | Opening Buy | 75,933.90 | | GOLDBB10 | 7.00 |
| 10/20/09 | Product shipment | | | GOLDBB10 | -7.00 |
| 10/31/09 | Interest received | | 148.40 | | |
| | Totals: | $147,520.63 | $80,235.13 | | |



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for November 2009

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $24,270.71 | $0.00 | $60.68 | $24,331.39 | $0 | $24,331.39 |

## Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased

$24,066.10   Unallocated Funds - Cash not being used as equity.

$265.29  -Accumulated loan fees less cash applied to loans

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 11/30/09 | Interest received | | 60.68 | | |
| | Totals: | $0.00 | $60.68 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 949-336-4405 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for December 2009

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $24,331.39 | $0.00 | $62.86 | $24,394.25 | $0 | $24,394.25 |

### Breakdown of Ending Balance

$0.00  -Loan Balance on Commoditites Purchased          $328.15 -Accumulated loan fees less cash applied to loans

$24,066.10   Unallocated Funds - Cash not being used as equity.

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 12/31/09 | Interest received | | 62.86 | | |
| | Totals: | $0.00 | $62.86 | | |



Hunter Wise Trading, LLC
Hunter Wise Financial Services. LLC

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for January 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $24,394.25 | $90,186.07 | $10.18 | $(65,781.64) | $81,732 | $15,950.36 |

### Breakdown of Ending Balance

$(65,101.50) -Loan Balance on Commoditites Purchased    $(680.14)-Accumulated loan fees less cash applied to loans

$0.00    Unallocated Funds - Cash not being used as equity.

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 1/6/10 | Commission for trade 14285 | 2,604.06 | | | |
| 1/6/10 | Opening Buy | 86,802.00 | | PALLAD | 200.00 |
| 1/31/10 | Interest paid | 446.10 | | | |
| 1/31/10 | Interest received | | 10.18 | | |
| 1/31/10 | Service Fees | 333.91 | | | |
| | Totals: | $90,186.07 | $10.18 | | |

## Unrealized Profit (Loss) on Open Positions as of Month End

| Trade Dt. | Position # | Position | | Product Balance | Initial Price | B/E Price | Month End MV Price | Int/Fees & Comm | Unrealized Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| 01/06/10 | 6972 | LN | PALLAD | 200 | 434.01 | 450.93 | 408.66 | (3,384.64) | (8,454.64) |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 949-336-4405 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for February 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $(65,781.64) | $835.65 | $0.00 | $(66,617.29) | $84,770 | $18,152.71 |

## Breakdown of Ending Balance

$(65,101.50)  -Loan Balance on Commoditites Purchased          $(1,515.79)-Accumulated loan fees less cash applied to loans

$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 2/28/10 | Interest paid | 486.05 | | | |
| 2/28/10 | Service Fees | 349.60 | | | |
| | Totals: | $835.65 | $0.00 | | |

## Unrealized Profit (Loss) on Open Positions as of  Month End

| Trade Dt. | Position # | | Position | Product Balance | Initial Price | B/E Price | Month End MV Price | Int/Fees & Comm | Unrealized Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| 01/06/10 | 6972 | LN | PALLAD | 200 | 434.01 | 455.09 | 423.85 | (4,215.26) | (6,247.26) |



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services. LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for March 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $(66,617.29) | $967.59 | $0.00 | $(67,584.88) | $93,688 | $26,103.12 |

## Breakdown of Ending Balance

$(65,101.50)  -Loan Balance on Commoditites Purchased      $(2,483.38)-Accumulated loan fees less cash applied to loans

$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 3/31/10 | Interest paid | 544.96 | | | |
| 3/31/10 | Service Fees | 422.63 | | | |
| | Totals: | $967.59 | $0.00 | | |

## Unrealized Profit (Loss) on Open Positions as of  Month End

| Trade Dt. | Position # | | Position | Product Balance | Initial Price | B/E Price | Month End MV Price | Int/Fees & Comm | Unrealized Profit (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| 01/06/10 | 6972 | LN | PALLAD | 200 | 434.01 | 459.86 | 468.44 | (5,170.45) | 1,715.55 |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 949-336-4405 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for April 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $(67,584.88) | $65,877.28 | $238,373.48 | $104,911.32 | $0 | $104,911.32 |

### Breakdown of Ending Balance

| | | |
|---|---|---|
| $0.00 | -Loan Balance on Commoditites Purchased | $26.42 -Accumulated loan fees less cash applied to loans |
| $104,884.90 | Unallocated Funds - Cash not being used as equity. | |

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 4/21/10 | Cash Received from you | | 68,245.18 | | |
| 4/21/10 | Offset to Pallad Loan | 65,101.50 | | | |
| 4/21/10 | Offset to Pallad Loan | | 65,101.50 | | |
| 4/28/10 | Closing Sell | | 105,000.00 | PALLAD | -200.00 |
| 4/30/10 | Interest paid | 356.70 | | | |
| 4/30/10 | Interest received | | 26.80 | | |
| 4/30/10 | Service Fees | 419.08 | | | |
| | Totals: | $65,877.28 | $238,373.48 | | |

### Realized Profit (Loss) on Closed Positions in  April

| Close Dt. | Position # | Type | Position | Quantity | Close Price | Int/Fees & Comm | Realized Profit (Loss) |
|---|---|---|---|---|---|---|---|
| 04/28/10 | 10494 | CS | PALLAD | -200 | 525.00 | (5,949.66) | 12,248.34 |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 949-336-4405 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services. LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for May 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $104,911.32 | $104,884.90 | $105,155.92 | $105,182.34 | $0 | $105,182.34 |

## Breakdown of Ending Balance

$0.00  -Loan Balance on Commoditites Purchased          $105,182.34 -Accumulated loan fees less cash applied to loans
$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 5/26/10 | Offset to CASH, Position 4397 | 104,884.90 | | | |
| 5/26/10 | Offset to CASH, Position 4397 | | 104,884.90 | | |
| 5/31/10 | Interest received | | 271.02 | | |
| | Totals: | $104,884.90 | $105,155.92 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 949-336-4405 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for June 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $105,182.34 | $0.00 | $75,400.46 | $180,582.80 | $0 | $180,582.80 |

### Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased

$0.00   Unallocated Funds - Cash not being used as equity.

$180,582.80 -Accumulated loan fees less cash applied to loans

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 6/9/10 | Cash Received from you | | 75,000.00 | | |
| 6/30/10 | Interest received | | 400.46 | | |
| | Totals: | $0.00 | $75,400.46 | | |



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

2361 Campus Drive Suite 130
Irvine, California 92612
www.hwcom.com

# Account Statement for July 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $180,582.80 | $0.00 | $466.51 | $181,049.31 | $0 | $181,049.31 |

### Breakdown of Ending Balance

| | |
|---|---|
| $0.00   -Loan Balance on Commoditites Purchased | $181,049.31 -Accumulated loan fees less cash applied to loans |
| $0.00   Unallocated Funds - Cash not being used as equity. | |

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 7/31/10 | Interest received | | 466.51 | | |
| | Totals: | $0.00 | $466.51 | | |



*Hunter Wise International , LLP*

1 Cornhill
London, EC3V 3ND
www.hwcom.com

# Account Statement for August 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $181,049.31 | $0.00 | $467.71 | $181,517.02 | $0 | $181,517.02 |

### Breakdown of Ending Balance

| | | |
|---|---|---|
| $0.00 | -Loan Balance on Commoditites Purchased | $181,517.02 -Accumulated loan fees less cash applied to loans |
| $0.00 | Unallocated Funds - Cash not being used as equity. | |

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 8/31/10 | Interest received | | 467.71 | | |
| | Totals: | $0.00 | $467.71 | | |



*Hunter Wise International , LLP*

1 Cornhill
London, EC3V 3ND
www.hwcom.com

## Account Statement for September 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $181,517.02 | $0.00 | $453.79 | $181,970.81 | $0 | $181,970.81 |

### Breakdown of Ending Balance

$0.00  -Loan Balance on Commoditites Purchased        $181,970.81 -Accumulated loan fees less cash applied to loans

$0.00  Unallocated Funds - Cash not being used as equity.

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 9/30/10 | Interest received | | 453.79 | | |
| | Totals: | $0.00 | $453.79 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE INTERNATIONAL, LLP  IMMEDIATELY BY
PHONE AT 011-44-203-008-7832 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise International , LLP*

1 Cornhill
London, EC3V 3ND
www.hwcom.com

# Account Statement for October 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL 60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $181,970.81 | $0.00 | $470.09 | $182,440.90 | $0 | $182,440.90 |

### Breakdown of Ending Balance

$0.00 -Loan Balance on Commoditites Purchased       $182,440.90 -Accumulated loan fees less cash applied to loans

$0.00  Unallocated Funds - Cash not being used as equity.

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 10/31/10 | Interest received | | 470.09 | | |
| | Totals: | $0.00 | $470.09 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE INTERNATIONAL, LLP  IMMEDIATELY BY
PHONE AT 011-44-203-008-7832 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



Hunter Wise Trading, LLC
Hunter Wise Financial Services, LLC

4966 South Rainbow Blvd
Suite 110
Las Vegas, NV 89118

# Account Statement for November 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL  60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $182,440.90 | $32,000.00 | $434.77 | $150,875.67 | $0 | $150,875.67 |

### Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased        $150,875.67 -Accumulated loan fees less cash applied to loans

$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 11/23/10 | Cash Sent to you | 32,000.00 | | | |
| 11/30/10 | Interest received | | 434.77 | | |
| | Totals: | $32,000.00 | $434.77 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 7082-784-0208 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services. LLC*

4966 South Rainbow Blvd
Suite 110
Las Vegas, NV 89118

# Account Statement for December 2010

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL  60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $150,875.67 | $0.00 | $389.76 | $151,265.43 | $0 | $151,265.43 |

## Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased

$0.00   Unallocated Funds - Cash not being used as equity.

$151,265.43 -Accumulated loan fees less cash applied to loans

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 12/31/10 | Interest received | | 389.76 | | |
| | Totals: | $0.00 | $389.76 | | |



*Hunter Wise Trading, LLC*
*Hunter Wise Financial Services, LLC*

4966 South Rainbow Blvd
Suite 110
Las Vegas, NV 89118

# Account Statement for January 2011

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL  60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $151,265.43 | $0.00 | $390.77 | $151,656.20 | $0 | $151,656.20 |

## Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased        $151,656.20 -Accumulated loan fees less cash applied to loans
$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 1/31/11 | Interest received | | 390.77 | | |
| | Totals: | $0.00 | $390.77 | | |



Hunter Wise Trading, LLC
Hunter Wise Financial Services, LLC

4966 South Rainbow Blvd
Suite 110
Las Vegas, NV 89118

# Account Statement for February 2011

Page 1 of 1

Bill Perry
980 North Michigan Ave
Suite 1400
Chicago, IL  60611

Account #: 10140-01
AE Name: Joe Dedios

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $151,656.20 | $151,668.68 | $12.48 | $0.00 | $0 | $0.00 |

## Breakdown of Ending Balance

$0.00   Unallocated Funds - Cash not being used as equity.

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Amount |
|---|---|---|---|---|---|
| 2/1/11 | Transfer to Trading Account 10202-01 | 2,500.00 | | | |
| 2/2/11 | Cash Sent to you | 149,168.63 | | | |
| 2/16/11 | Invalid Interest | | 0.05 | | |
| 2/28/11 | Interest paid | 0.05 | | | |
| 2/28/11 | Interest received | | 12.43 | | |
| | Totals: | $151,668.68 | $12.48 | | |



*Hunter Wise Trading, LLC*

4966 S. Rainbow Blvd.
Suite 110
Las Vegas, NV 89118
888-349-2450
https://customers.hwcom.com

## Account Statement for February 2011

AE Name: Joe Dedios

Page 1 of 1

U.S. Capital Trading & Finance, Ltd

980 N. Michigan Ave
Suite 1400
Chicago, IL  60611

Trading Account

perry@uscapital.com

Account #: 10202-01

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $0.00 | $2,500.00 | $152,004.26 | $149,504.26 | $0.00 | $149,504.26 |

### Breakdown of Ending Balance

$0.00    -Loan Balance on Commoditites Purchased          $149,504.26  -Accumulated loan fees less cash applied to loans

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Prod Activity |
|---|---|---|---|---|---|
| 2/1/11 | Transfer from retail account Bill Perry | | 2,500.00 | | |
| 2/1/11 | Start up Licensing Fee | 2,500.00 | | | |
| 2/2/11 | Transfer from Bill Perry 10140 | | 149,168.63 | | |
| 2/28/11 | Interest received | | 335.63 | | |
| | Totals: | $2,500.00 | $152,004.26 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE FINANCIAL SERVICES, LLC
IMMEDIATELY BY PHONE AT  888-349-2450 OR 702-784-0208 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading, LLC*

4966 S. Rainbow Blvd.
Suite 110
Las Vegas, NV 89118
888-349-2450
https://customers.hwcom.com

## Account Statement for March 2011

AE Name: Joe Dedios

Page 1 of 1

U.S. Capital Trading & Finance, Ltd

980 N. Michigan Ave
Suite 1400
Chicago, IL  60611

Trading Account

perry@uscapital.com

Account #: 10202-01

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $149,504.26 | $250.03 | $386.22 | $149,640.45 | $98,365.54 | $248,005.99 |

### Breakdown of Ending Balance

$0.00   -Loan Balance on Commoditites Purchased        $149,640.45  -Accumulated loan fees less cash applied to loans

### Physical Commodity Balance as of 3/31/2011

| Position  Type | Commodity | Commodity Balance | |
|---|---|---|---|
| Others | GOLD DEL | 7.00 | Unit(s) |

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Prod Activity |
|---|---|---|---|---|---|
| 3/10/11 | Product Receipt | | | | 7.00 |
| 3/31/11 | Interest received | | 386.22 | | |
| 3/31/11 | Service Fees | 250.03 | | | |
| | Totals: | $250.03 | $386.22 | | |

 *Hunter Wise Trading, LLC*

4966 S. Rainbow Blvd.
Suite 110
Las Vegas, NV 89118
888-349-2450
https://customers.hwcom.com

AE Name: Joe Dedios

## Account Statement for April 2011

Page 1 of 1

U.S. Capital Trading & Finance, Ltd

980 N. Michigan Ave
Suite 1400
Chicago, IL  60611

Trading Account

perry@internationalmetals.com

Account #: 10202-01

| Beginning Balance | Charges | Credits | Ending  Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $149,640.45 | $210.27 | $104,109.24 | $253,539.42 | $0.00 | $253,539.42 |

### Breakdown of Ending Balance

$0.00  -Loan Balance on Commoditites Purchased          $253,539.42  -Accumulated loan fees less cash applied to loans

### Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Prod Activity |
|---|---|---|---|---|---|
| 4/19/11 | Closing Sell | | 103,631.50 | GOLDBB10 | -7.00 |
| 4/30/11 | Interest received | | 477.74 | | |
| 4/30/11 | Service Fees | 210.27 | | | |
| | Totals: | $210.27 | $104,109.24 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE TRADING, LLC  IMMEDIATELY BY PHONE
AT  888-349-2450 OR 702-784-0208 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM



*Hunter Wise Trading. LLC*

4966 S. Rainbow Blvd.
Suite 110
Las Vegas, NV 89118
888-349-2450
https://customers.hw.com.com

## Account Statement for May 2011

AE Name: Joe Dedios

Page 1 of 1

U.S. Capital Trading & Finance, Ltd          Trading Account          perry@internationalmetals.com

980 N. Michigan Ave                                                          Account #: 10202-01
Suite 1400
Chicago, IL  60611

| Beginning Balance | Charges | Credits | Ending Balance | Total Market Value | Total Account Value |
|---|---|---|---|---|---|
| $ 253,539.42 | $ 254,025.37 | $ 485.95 | $ 0.00 | $ 0.00 | $ 0.00 |

Breakdown of Ending Balance

## Transaction Detail

| Transaction Date | Transaction Description | Charges | Credits | Product | Prod Activity |
|---|---|---|---|---|---|
| 5/24/11 | Cash disbursement | 254,025.37 | | | |
| 5/31/11 | Interest received | | 485.95 | | |
| | Totals: | $ 254,025.37 | $ 485.95 | | |

IF THE ABOVE STATEMENT IS NOT IN AGREEMENT WITH YOUR RECORDS, PLEASE CONTACT HUNTER WISE TRADING, LLC  IMMEDIATELY BY PHONE AT  888-349-2450 OR 702-784-0208 AND CONFIRM SUCH NOTIFICATION VIA EMAIL TO CUSTOMER.SERVICE@HWCOM.COM

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

U.S. POSTAGE PAID
LAKE DELTON, WI
NOV 09 16
AMOUNT
$6.45
R2305K14060
33401
1008

UNITED STATES POSTAL SERVICE ®
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

Bill D. Perry
112 Harvest W.
Petersburg, IN, 47567

TO:

Honorable Judge D. Middlebrooks
U.S. District Court of Southern Florida
701 Clematis St. Room # 259
West Palm Beach, FL. 33401

FOR DOMESTIC AND INTERNATIONAL USE

Label 228, March 2016

UNITED STATES POSTAL SERVICE ®

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

PRIORITY MAIL ★

FROM PRIORITY MAIL ★

PRIORITY ® ★ MAIL ★


USPS UNSPECTED

- DATE OF DELIVERY SPECIFIED*
- USPS TRACKING™ INCLUDED*
- INSURANCE INCLUDED*
- PICKUP AVAILABLE
  * Domestic only

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

Expected Delivery Day: 11/12/2016
USPS TRACKING NUMBER

9505 5127 7896 6315 0301 78